AO 91 (Rev. 11/11)  Criminal Complaint

SEALED

## UNITED STATES DISTRICT COURT

for the

Eastern District of California

FILED

JAN 2 3 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| CARRIE ALAINE MARKIS | ) | 2:19 - MJ - 0021   EFB |
| | ) | |
| *Defendant(s)* | ) | |

# CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___February 2014 through August 2014___ in the county of ___Sacramento___ in the

___Eastern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1) | February 2014 through August 2014 - Conspiracy to distribute, manufacture, and possess WID a controlled substance; |
| 21 U.S.C. § 841(a)(1) | On or about April 12, 2014 – Distribution of a controlled substance; and |
| 21 U.S.C. § 841(a)(1) | On or about April 12, 2014 – Distribution of a controlled substance |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Aron Mann
Homeland Security Investigations
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __1-23-2019__

_____
*Judge's signature*

City and state: __Sacramento, CA__

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANT**

I, Aron Mann, being duly sworn, hereby depose and state as follows:

## I.   SCOPE OF REQUESTED CRIMINAL COMPLAINT & ARREST WARRANT

1.  During this investigation, law enforcement officers have learned that Carrie Alaine Markis ("**MARKIS**") has conspired with the administrators of at least three dark web marketplace vendor accounts to sell more than 20,000 opioid and opiate-based prescription pills and products to individuals across the United States.

2.  This affidavit is submitted in support of an arrest warrant and criminal complaint charging **MARKIS** with:

    COUNT ONE – Beginning in about February 2014 and continuing through about August 2014: Knowingly and intentionally conspiring and agreeing with at least one other person to distribute fentanyl, a Schedule I Controlled Substance, in violation of Title 21 U.S.C. §§ 846 and 841(a)(1).

    COUNT TWO – On or about April 12, 2014: Distributing fentanyl, a Schedule I Controlled Substance, in violation of 21 U.S.C. § 841(a)(1).

    COUNT THREE – On or about April 13, 2014: Distributing fentanyl, a Schedule I Controlled Substance, in violation of 21 U.S.C. § 841(a)(1).

## II.   SCOPE OF REQUESTED SEARCH WARRANTS

3.  This affidavit also supports applications for warrants to search locations further described in **Attachments A-1** through **A-2**. The contraband, objects, and information for which we will search are described in **Attachment B**. Attachments A-1 through A-2 and Attachment B are incorporated by reference.

4.  We request authority to search in two locations:

    a.  **SUBJECT RESIDENCE:** 10929 Tower Park Drive, Rancho Cordova, CA 95670, a residence more fully described in Attachment A-1;

    b.  **SUBJECT VEHICLE:** A 2011 Black BMW 335i with California license plate 7NUE460. The car is registered to **MARKIS**, bears VIN WBAKG7C55BE264290, and is more fully described in Attachment A-2;

## III.    AGENT BACKGROUND

5.    I am a Special Agent with Homeland Security Investigations ("HSI") and have been so employed since June 2016. As a requirement for employment as an HSI Special Agent, I successfully completed the Criminal Investigator Training Program ("CITP") located at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. At the conclusion of CITP, I completed an additional Homeland Security Investigations Special Agent Training Academy. As part of the training at FLETC, I received extensive instruction in the areas of immigration law, customs law, illegal narcotics, firearms, surveillance, and interview techniques.

6.    As a special agent with HSI, part of my duties include the investigation of criminal violations as proscribed by 21 U.S.C § 841 (narcotics trafficking) and 21 U.S.C § 846 (drug conspiracy). Moreover, as an HSI special agent, I am a "Federal Law Enforcement Officer," authorized to investigate violations of the laws of the United States and to execute search and seizure warrants issued under the authority of the United States.

7.    I have conducted and participated in criminal investigations for violations of federal and state laws including, but not limited to, narcotics trafficking, child exploitation, money laundering, firearms, fraud, and other organized criminal activity. I have prepared, executed, and assisted in numerous search and arrest warrants. I have also conducted and participated in criminal and administrative interviews of witnesses and suspects. I am familiar with the formal methods of illegal narcotics investigations, including electronic surveillance, visual surveillance, general questioning of witnesses, search warrants, confidential informants, the use of undercover agents, and analysis of financial records. I have participated in investigations of organizations involved in the manufacture, distribution, and possession with intent to distribute controlled substances.

8.    I am currently conducting an investigation of a conspiracy to distribute various opioids. The investigation involves defendant **MARKIS** and others. The facts and information set forth in this Affidavit are based upon my personal knowledge obtained during this investigation, personal observations, my training and experience, information obtained from other agents and witnesses, and other documents and records obtained during this investigation.

9.    Because I submit this Affidavit for the limited purpose of setting forth probable cause for the requested search warrants, arrest warrant, and criminal complaint, I have not included every fact known to me concerning this investigation. I have only included what I believe are adequate facts to establish probable cause that **MARKIS** has committed violations of

2

Title 21, United States Code, Sections 841(a)(1) and 846, and that evidence of these violations will be found in the locations to be searched. However, I have not intentionally omitted any fact material to this Court's determination of probable cause to search the locations identified in Attachments A-1 through A-2.

10. In addition, where I describe statements made by other people (including other special agents and law enforcement officers), the statements are described in sum, substance, and relevant part. Similarly, where I describe information contained in reports and other documents or records in this affidavit, this information is also described in sum, substance, and relevant part.

## IV.   TECHNICAL BACKGROUND

11. Digital currency (also known as crypto-currency) is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency (i.e. currency created and regulated by a government.) Digital currency exists entirely on the Internet and is not stored in any physical form. Digital currency is not issued by any government, bank, or company and is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Digital currency is not illegal in the United States and may be used for legitimate financial transactions. However, digital currency is often used for conducting illegal transactions, such as the sale of controlled substances.

12. Bitcoin[1] is a type of digital currency. Bitcoin payments are recorded in a public ledger that is maintained by peer-to-peer verification and is thus not maintained by a single administrator or entity. Individuals can acquire Bitcoins either by "mining" or by purchasing Bitcoins from other individuals. An individual can "mine" for Bitcoins by allowing his/her computing power to verify and record the Bitcoin payments into a public ledger. Individuals are rewarded for this by being given newly created Bitcoins.

13. An individual can send and receive Bitcoins through peer-to-peer digital transactions or by using a third-party broker. Such transactions can be done on any type of computer, including laptop computers and smart phones.

14. Bitcoins can be stored in digital "wallets." A digital wallet essentially stores the access code that allows an individual to conduct Bitcoin transactions on the public ledger. To access Bitcoins on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key.") The public address can be analogized to an

---

[1] As of January 8, 2019, one Bitcoin is equal to about $4,025.00 USD.

3

account number while the private key is like the password to access that account.

15. Even though the public addresses of those engaging in Bitcoin transactions are recorded on the public ledger, the true identities of the individuals or entities behind the public addresses are not recorded. If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity. Bitcoin transactions are, therefore, described as "pseudonymous," meaning they are partially anonymous.

16. Through the dark web or darknet – websites accessible only through encrypted means – individuals have established online marketplaces, such as Silk Road and AlphaBay, for narcotics and other illegal items. These markets often only accept payment through digital currencies, such as Bitcoin. Accordingly, a large amount of Bitcoin sales or purchases by an individual is often an indicator that the individual is involved in narcotics trafficking or the distribution of other illegal items. Individuals intending to purchase illegal items on Silk Road-like websites need to purchase or barter for Bitcoins. Further, individuals who have received Bitcoin as proceeds of illegal sales on Silk Road-like websites need to sell their Bitcoin to convert them to fiat (government-backed) currency. Such purchases and sales are often facilitated by peer-to-peer Bitcoin exchangers who advertise their services on websites designed to facilitate such transactions.

17. Dark web sites, such as Silk Road, AlphaBay, Wall Street, and Dream, operate on "The Onion Router" or "TOR" network. The TOR network ("TOR") is a special network of computers on the Internet, distributed around the world, that is designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing the network, and, thereby, the locations and identities of the network's users. TOR likewise enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, which are referred to as "hidden services" on the TOR network. Such "hidden services" operating on TOR have complex web addresses, generated by a computer algorithm, ending in ".onion" and can only be accessed through specific web browser software designed to access the TOR network.

## V.   BACKGROUND ON NARCOTICS

18. I have received training and have experience in the methods used by drug traffickers to illegally produce, transport, and distribute controlled substances, including via the dark web. I am familiar with all the formal methods of investigation, including, electronic surveillance, visual surveillance, general questioning of witnesses, search warrants, confidential informants, the use of undercover agents, and analysis of financial records. I

have participated in investigations of organizations involved in the manufacture, distribution, and possession with intent to distribute controlled substances.

19. Specifically, I know based on my training and experience that drug distributors often reside at and store or maintain the following evidence at their residences and vehicles:

    a.   Books, records, receipts, notes, ledgers, and other papers relating to the distribution of narcotics;

    b.   Cash, currency and records relating to controlled substances income and expenditures of money and wealth, for example, money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, check registers, and prepaid debit cards;

    c.   Documents indicating travel in interstate and foreign commerce, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills;

    d.   Firearms, ammunition, silencers, and other dangerous weapons;

    e.   Photographs, negatives, video tapes, films, undeveloped film, electronic storage devices and the contents therein, and slides depicting the subjects of the investigation and their criminal associates, their assets and/or controlled substances;

    f.   Items of personal property that tend to identify the person(s) in residence, and the occupancy, control, or ownership of the subject premises, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

    g.   Devices used to communicate with other individuals involved in the transportation, distribution, and possession with intent to distribute controlled substances, including cellular telephones, mobile telephones, phone answering machines, telephone answering machine tapes, beepers or pagers, and devices used to conduct counter-surveillance against law enforcement, such as radio scanners, police radios, surveillance cameras and monitors, anti-bugging devices and devices used to detect the presence of wiretaps, recording devices or transmitters, and/or receipts or literature describing the same; and,

h.  Assigned telephone numbers for telephone, cellular telephone, and pagers found on the premises or vehicles, along with telephone toll records, papers, notebooks, and other items, documenting the manufacture, distribution, or possession with intent to distribute marijuana and other controlled substances, and communications among co-conspirators.

20. Based upon my training and experience, as well as the collective knowledge and experience of other assisting agents, I am aware that it is a common practice for individuals who traffic in illicit drugs to keep records, proceeds from drug transactions, and other evidence at their residences.

21. Based on my training, I know that records are often maintained by drug traffickers. Based on my training in investigating drug trafficking organizations, I know that drug traffickers tend to keep their records for a long period of time. Further, because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

22. It is also a common practice for drug traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances or items associated with the production of controlled substances. Drug traffickers often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking is also often maintained in their residences. Further, drug traffickers often maintain cash hoards at their residences. Cash hoards are used for the purchase of narcotics and are the result of the sale of controlled substances. Cash hoards are often stored in secured environments, such as safes and vaults.

23. Drug traffickers often possess firearms and other dangerous weapons to protect their profits and supply of drugs from others who might attempt to forcibly take the traffickers' profits and supply of drugs.

24. In a number of searches of residences associated with drug traffickers in prior investigations in which other agents and I have been involved, the above-referenced evidence has typically been recovered from residences and other structures and areas on the property being searched, such as storage sheds or parked vehicles on or around the premises.

25. From my background and experience I know that individuals engaged in illegal income producing businesses seek to conceal the income generated from such businesses. In particular, individuals engaged in drug trafficking often conduct their transactions in cash to avoid creating bank records related to such transactions. Individuals engaged in drug trafficking also often maintain cash hoards at their residences to avoid creating bank records documenting the incoming proceeds. Individuals engaged in drug trafficking also often conduct currency transactions in a manner to prevent financial institutions from filing currency transaction reports ("CTRs"). Financial institutions are required to file CTRs for any transaction exceeding $10,000 involving currency deposits or withdrawals. CTRs are filed with the U.S. Department of Treasury. CTRs contain personal information related to the transactors, including name, age, location, bank account information and other identifiers. To prevent financial institutions from filing CTRs, individuals will "structure," or attempt to structure, their currency transactions so that a transaction involving greater than $10,000 in currency will be broken down into multiple transactions in amounts of $10,000 or less.

26. Based on my training and experience, I know that patterns of interstate deposits of cash followed by immediate withdrawals of cash are often associated with the movement of drug proceeds. This is particularly the case when the accounts are used only for interstate deposits and withdrawals, and do not involve daily banking activities, such as point of sale transactions or payroll transactions. These types of accounts are referred to as "funnel accounts" because such accounts are used to funnel drug proceeds.

27. I am aware that the proceeds generated from both legal and illegal activities may be spent many years after the activity has stopped. Thus, records reflecting income and expenditures for the time period spanning the activity and those years immediately following the end of this activity are essential to any financial investigation.

28. Often the method of distribution (when a criminal activity is or has been present) generates records of events as well. These records can be in the form of bills of lading, contracts, air waybills, delivery receipts, billings, manifests, log books, fuel receipts, motel/hotel receipts, travel records, credit card charges and other related business documents.

29. Individuals who amass proceeds from legal or illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, money orders, etc.   I know from personal knowledge that individuals attempting to conceal income from the government often use a variety of methods to conceal the income including creating false business entities, using known and unknowing individuals, and hidden assets in order to disguise and conceal income.

30. Based on my training and experience, I am aware that individuals engaged in legal and illicit activity and money laundering often secret and secure valuable documents and assets in bank safe deposit boxes.  Examples of these types of documents and assets include real property deeds, documents relating to ownership of various assets, bearer bonds, debt instruments, jewelry, currency, passports, identification documents, false identification, and the like.

## VI.   FACTS ESTABLISHING PROBABLE CAUSE

*Initial investigative information*

31. I am part of the Northern California Illicit Digital Economy ("NCIDE") Task Force composed of HSI, the United States Postal Inspection Service ("USPIS"), the Federal Bureau of Investigation, and the Drug Enforcement Administration.  As a function of this task force, investigators have reviewed law enforcement-seized dark web marketplace data. Our goal is to identify vendors involved in the distribution of narcotics and other illicit items.

32. In July 2017, United States law enforcement shut down the AlphaBay dark web marketplace, the largest illicit TOR-based marketplace to date.  A review of the data seized from the AlphaBay servers and from other shuttered marketplaces led to the identification of a vendor in the Sacramento, California, area.  Operating under the name "Farmacy41," this vendor sold opioid and opiate-based prescription pills and products.

33. In early September 2018, I reviewed seized marketplace data revealing that the operator of "Farmacy41" was **MARKIS**, who currently resides in Rancho Cordova, California. **MARKIS** is a registered nurse in the State of California and holds a master's degree in nursing science and health care leadership from the University of California, Davis.

8

### *Review of seized Silk Road 2.0 data*

34.   Farmacy41 operated online storefronts between at least November 2013 and April 2016. Her vendor sites appeared on the Silk Road 2.0, Pandora, Agora, Blue Sky, and AlphaBay marketplaces.  On these marketplaces, **MARKIS** sold prescription hydrocodone, oxycodone, hydromorphone, morphine, methadone, and fentanyl transdermal patches.

35.   Silk Road 2.0 was a dark web marketplace seized by federal law enforcement in about November 2014.  As a result of that operation, law enforcement officers can now query Silk Road 2.0 records, including sales histories and private messages sent between vendors and customers.

36.   Farmacy41 registered an account on the Silk Road 2.0 marketplace in November 2013. The account was last active on or about May 2, 2014.  On this marketplace, Farmacy41 conducted 734 sales and earned roughly 326 Bitcoin, equivalent to about $232,494.00 at the time.  User reviews of Farmacy41 are overwhelmingly positive.  The majority of the user's ratings are five out of five stars.  According to the seized server data, Farmacy41 sold the following products on Silk Road 2.0:

- Hydrocodone: 8,723 pills
- Oxycodone: 2,690 pills
- Methadone: 839 pills
- Hydromorphone: 652 pills
- Morphine: 70 pills
- Fentanyl: 16 patches

37.   Farmacy41's Pretty Good Privacy ("PGP")[2] key was created on November 7, 2013, with the name "farmacy41," the email "farmacy41@blackmarket.tor," and fingerprint FD6C 8DEA AE1E C521 81C3 9E55 A8B2 4320 7518 7690.  The PGP fingerprint is used to identify the full, unique public key.  In her profile terms and conditions, **MARKIS** provided the email "farmacy41@safe-mail.net" as a method of contact.

38.   In private messages with her customers on Silk Road 2.0, **MARKIS** disclosed that she was a licensed medical professional living in California.  Additionally, **MARKIS** revealed that

---

[2] PGP is an encryption program that provides cryptographic privacy and authentication for data communication. PGP makes use of public-key encryption, in which one key is used to encrypt data (the public key) and another key is used to decrypt it (the private key).  This technology allows a dark-web drug vendor to communicate in an encrypted format by broadcasting his/her public key to customers, who can then encrypt messages they want to send to the vendor.

she was a woman and that she sourced her narcotics from "individuals who supplement their income through diversion," meaning people who sell the prescription pills a doctor has authorized for them.

39.  On or about March 31, 2014, the Farmacy41 vendor account on Silk Road 2.0 was allegedly phished.[3] The attacker allegedly took over the vendor account, pretended to be Farmacy41, and stole Bitcoin from prospective customers. At the time, the Farmacy41 vendor account on Pandora Market sent Pandora customers private messages warning them that the vendor account on Silk Road 2.0 had been compromised. For example, on or about April 3, 2014, the Farmacy41 vendor on Pandora sent a Pandora customer a message stating, "One of my buyers hassled this guy so hard that he actually admitted to hacking both my safe-mail and my SR account! This buyer is a total PAIN IN THE ASS, but he turned out to be the hero in all this...his constant nagging drove the guy insane."

40.  On April 4, 2014, a Silk Road 2.0 buyer account using the handle of "snarkis" sent a private message to the impostor Farmacy41. The message pled that the attacker return the stolen funds to "the innocent people who placed their trust in the REAL farmacy41." Later review of AlphaBay marketplace data showed that a buyer account with the handle "snarkis" had ordered marijuana and requested that it be sent to **MARKIS** at the **SUBJECT RESIDENCE**. As such, I believe that **MARKIS** was responsible for sending the "snarkis" private message on Silk Road 2.0 on April 4, 2014.

41.  On or about April 6, 2014, **MARKIS** regained control of the Farmacy41 vendor account on Silk Road 2.0. At that time, she changed the account contact email to "fuckyou41@safe-mail.net" and created a new PGP key with the name "farm41" and fingerprint of 0210 391D 31E7 A5BE 50F3 3516 6E5B 0265 9730 3659.

### *Review of seized Pandora marketplace data*

42.  On the Pandora marketplace, Farmacy41 was active from December 2013 until August 2014. The vendor completed 393 sales and earned 206 Bitcoin, worth about $122,000.00 at the time. All of Farmacy41's recorded feedback ratings are five out of five stars. According to the seized server data, Farmacy41 sold the following products on Pandora:

- Hydrocodone: 2,577 pills
- Oxycodone: 2,069 pills
- Morphine: 311 pills

---

[3] Phishing refers to the theft of account credentials through means of social engineering.

- Hydromorphone: 211 pills
- Methadone: 161 pills
- Fentanyl: 32 patches

43. In private messages with customers on the Pandora marketplace, the owner of Farmacy41 discussed having a master's degree and the fact that the Farmacy41 account was phished on Silk Road 2.0. In a private message on or about April 2, 2014, the owner also explained that her moniker was Farmacy41 because she was 41 years old. The owner added that she would be 42 in three months. **MARKIS'** birthday is July 4.

44. In another private message, **MARKIS** disclosed that her "cover biz" was Nutrivite and that she was a nutraceutical product distributor. A United States Postal Inspection Service Inspector confirmed that **MARKIS** had a United States Postal Service account with the business name Nutrivite assigned as the company name on the account.

45. In a private message on April 9, 2014, to user "blueskies420," Farmacy41 provided a Bitcoin address for direct payment. Agents also found this address in a review of a digital currency exchange account belonging to **MARKIS**. A note of "blueskies" was attached to this address on the digital currency exchange account in the notes portion controlled by the account holder.

### *Review of seized AlphaBay marketplace data*

46. Farmacy41 was active on the AlphaBay marketplace between November 2015 and April 2016. It completed 262 sales and earned 184 Bitcoin, worth about $74,235.00 at the time. According to the seized server data, Farmacy41 sold the following products on AlphaBay:

- Oxycodone 10mg-30mg: 865 pills
- Hydrocodone 10mg: 740 pills
- Morphine 100mg: 615 pills
- Hydromorphone 8mg: 615 pills
- Fentanyl transdermal 100mcg: 64 patches
- Percocet 5mg: 60 pills
- OxyContin 60mg: 35 pills

47. On her AlphaBay vendor profile page, Farmacy41 wrote the following: *"For those who are not familiar with my excellent service and reputation (SR2, Pandora, Blue Sky, Agora)*

*please refer to the feedback listed on Grams:*
*http://grams7enufi7jmdl.onion/infodesk/vendor/0x6E5B026597303659"*[4]

48. As explained above, the Silk Road 2.0 buyer account "snarkis" sent a private message to the person who allegedly phished the Farmacy41 vendor account on Silk Road 2.0. This buyer account also registered on AlphaBay in May 2015 and was last active on June 30, 2017.

49. User snarkis made about 29 AlphaBay purchases of various items, including Xanax, THC and CBD vape oil cartridges, marijuana, ecstasy, and hacked HBO NOW accounts. On May 20, 2017, snarkis ordered a 500ml marijuana shatter cartridge from the vendor GoodCatKilla. In the address section of the order, snarkis supplied the unencrypted buyer information of: **MARKIS** at the **SUBJECT RESIDENCE.**

### *Digital currency exchange account links MARKIS to Farmacy41*

50. During this investigation, the Department of Homeland Security issued a subpoena to a leading digital currency exchange company ("DCE"). The subpoena requested information on accounts matching the known identifiers of **MARKIS**. The DCE returned information about an account with the following properties:

   - Name: Carrie Markis
   - Address: 10929 Tower Park Drive, Rancho Cordova, CA
   - Emails: carriemarkis@hotmail.com; farm41@hotmail.com; farm41@outlook.com

51. The DCE reported that, between November 2013 and January 2015, **MARKIS** sold about 492.99 Bitcoin to the DCE. This would have been worth about $288,050.00 at the time.

52. There are four instances in the DCE account in which **MARKIS** entered comments for Bitcoin transactions and utilized the signature "f41." This is the same signature Farmacy41 used in marketplace messages to buyers.

53. Farmacy41 also provided at least two Bitcoin addresses found in this account to buyers on Silk Road 2.0:

---

[4] Grams is a now-defunct dark web hidden service that catalogued the PGP keys and reviews of dark web vendors. This enabled others to verify a vendor's identity and browse their reviews across multiple marketplaces.

- Farmacy41 provided 1Bn9MPKbjh11X4sZbFMUYXrMLVHbeHFSQy to user "hammer911" on February 26, 2014. In the DCE account, this receiving address is marked with the label "hammer911".

- Farmacy41 provided 1KGYQsSbJSJPfvSuvhcvE67BBUT1nqMuP to user "kazemir.malevich" on March 19, 2014. In the DCE account, this receiving address is marked with the label of "kaze".

54.  The DCE identified **MARKIS** as a high-volume Bitcoin trader. Because of this, in December 2014, the company sent **MARKIS** a message requesting the source of **MARKIS's** Bitcoin. **MARKIS** replied that she had begun purchasing Bitcoin as an investment strategy in 2012, while she was a graduate student at the University of California, Davis. **MARKIS** also said that, beginning in 2014, she earned about $100 an hour – paid in Bitcoin – for healthcare and legal nurse consulting services. **MARKIS** said that, due to HIPPA regulatory restrictions, she could not disclose the specific customers but that she could provide reference letters on demand. The DCE then requested these reference letters. Never providing the requested letters, **MARKIS** transferred her funds out of the DCE. She said she did so in order "to prevent any potential security and/or privacy compromises associated with the disclosure of personal information."

55.  Between October 2014 and December 2016, **MARKIS** sold about 274.28 Bitcoin through a second DCE account with another entity. This Bitcoin would have been worth about $79,656.00 at the time. This DCE closed **MARKIS**'s account for engaging in restricted activities and prohibited payments.

56.  Finally, between October 2015 and July 2017, **MARKIS** sold about 126.54 Bitcoin through a third DCE. This Bitcoin would have been worth about $62,000.00 at the time. This DCE also closed **MARKIS'** account after the exchange saw that transactions that were tied to dark web marketplaces. The company concluded that **MARKIS** was likely a dark web vendor.

### *PayPal account links MARKIS to Farmacy41*

57.  Several PayPal accounts contain information connecting **MARKIS** to the dark web vendor moniker Farmacy41. Two PayPal accounts – both owned by **MARKIS** – indicate that she bought about $7,336 in U.S. postage stamps over a 10-month period and purchased 400 Ziploc 1.2" x 1.5" zipper bags. Another account listed the email address farmacy41@safe-mail.net. As described above, this email address was the listed email address for the Farmacy41 vendor account on Silk Road 2.0.

58. I issued a subpoena to Comcast Cable Communications for an IP address that accessed one of MARKIS's PayPal accounts as recently as of September 2018. In response to the subpoena, Comcast Cable Communications reported that the subscriber for the accessing IP address was **MARKIS** at the **SUBJECT RESIDENCE**.

*Review of bank account data belonging to MARKIS*

59. In November 2018, I reviewed information on a bank account owned by **MARKIS**. Account information from several DCE companies indicated that **MARKIS** transferred her Bitcoin proceeds to this bank account.

60. My review showed that, between January 2014 and October 2018, digital currency exchanges alone deposited more than $200,000 into this bank account, owned by **MARKIS**. Generally speaking, I estimate that only a handful of the hundreds of the account's deposits came from a non-DCE source and that these deposits were a small fraction of the dollar value put into the account. Some of the account funds were used to make tax payments of more than $20,000 to the United States Treasury.

*Interviews of Farmacy41 customers*

61. On December 7, 2018, law enforcement officers interviewed a person ("BUYER-1"), who allegedly purchased opioid prescription pills from Farmacy41 on the Silk Road 2.0 and Pandora marketplaces. BUYER-1 was identified because s/he sent their shipping address information in unencrypted plaintext to Farmacy41 during their narcotics purchases. This shipping address was in the Eastern District of California, and agents conducted the interview in the Eastern District of California.

62. Law enforcement officers presented BUYER-1 with screenshots of his/her Farmacy41 purchases on Silk Road 2.0 and Pandora. These purchases included five orders of oxycodone and hydrocodone pills. BUYER-1 confirmed that s/he did, in fact, make those purchases and received the expected products in the mail. The following are the detailed purchases of BUYER-1 from Farmacy41:
   - December 6, 2013: One (1) oxycodone 80mg
   - December 11, 2013: Ten (10) hydrocodone 10mg
   - December 31, 2013: Two (2) oxycodone 40mg
   - January 11, 2014: Eight (8) hydrocodone 10mg
   - July 3, 2014: Five (5) oxycodone 30mg

14

63.   On December 20, 2018, law enforcement officers interviewed a second person ("BUYER-2"), who allegedly purchased fentanyl transdermal patches from Farmacy41 on the Pandora marketplace. Investigators identified BUYER-2 because s/he also sent his/her shipping information unencrypted on the dark web marketplace. That shipping address was in the Northern District of Ohio, where the interview occurred.

64.   Officers presented BUYER-2 with screenshots of his/her six Pandora purchases of fentanyl patches from Farmacy41. BUYER-2 confirmed that they had placed these orders and, in response, received mailed packages containing the fentanyl. The following are the detailed purchases of BUYER-2 from Farmacy41:
   - January 4, 2014: One (1) 10.2mg fentanyl transdermal patch
   - January 5, 2014: One (1) 10.2mg fentanyl transdermal patch
   - January 29, 2014: One (1) 10.2mg fentanyl transdermal patch
   - January 29, 2014: One (1) 10.2mg fentanyl transdermal patch
   - April 12, 2014: One (1) 5mg fentanyl transdermal patch
   - April 13, 2014: One (1) 5mg fentanyl transdermal patch

65.   The **SUBJECT VEHICLE** is registered to **MARKIS** at the **SUBJECT RESIDENCE**. She purchased the car in about December 2014 or early January 2015.

66.   On September 10, 2018, I received confirmation from the Sacramento Municipal Utility District that the account subscriber for utilities at the **SUBJECT RESIDENCE** was **MARKIS**, and that the service had been active in her name since November 2007.

67.   On December 17, 2018, law enforcement conducted surveillance at the **SUBJECT RESIDENCE** and observed **MARKIS** leave the property in the **SUBJECT VEHICLE**. She went to the Rio Del Oro Racquet Club in Sacramento.

68.   On January 22, 2019, a USPIS Inspector confirmed that **MARKIS** received mail at the **SUBJECT RESIDENCE** as recently as of January 10, 2019, and that no other names receive mail at the **SUBJECT RESIDENCE** except **MARKIS**.

## VII. SEARCH OF DIGITAL INFORMATION

69.   I am aware that users and vendors of online black markets use a computer to access the dark web where online black markets are located. Your affiant is also aware that individuals must use an electronic device to locate and communicate with bitcoin exchangers and purchase bitcoins. Users must establish an account on an online black market's website to purchase goods and also establish accounts to initiate initial trades with

bitcoin exchangers. Users also must establish electronic wallets to receive and send bitcoins to purchase drugs. These wallets are electronic in nature and may be stored on mobile devices (phones or tablets), external or removable media, and/or computers. Your affiant is aware that once contact is made with a bitcoin exchanger on a digital currency exchange platform such as localbitcoins.com, all subsequent contact and transactions can be conducted from one phone to the other during a face to face transaction, exchanging currency for bitcoins. Your affiant is also aware that users can back-up wallets to paper printouts that would contain information to restore the wallet in an electronic form (cold storage). Passwords for access to online black markets, as well as for electronic wallets, are typically complex and are often written down or saved in an accessible manner on paper or on some electronic device. Your affiant believes that these are located in the **SUBJECT RESIDENCE**, in the **SUBJECT VEHICLE**, and on the person of **MARKIS**.

70. As described above and in Attachment B, your affiant submits that computers, smart phones, and possibly other storage media will be found within the **SUBJECT RESIDENCE, SUBJECT VEHICLE**, and on the person of **MARKIS**, and there is probable cause to search and seize those items for the reasons said below. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis. Furthermore, your affiant submits that sufficient probable cause has been established to search and seize any online black-market vendor accounts, online digital currency exchange platform accounts, and the data contained therein. Due to the inherent illicit and anonymous nature of these accounts, and that there is no identified service provider for these accounts, legitimate, compliant or not, to which legal process may be served; your affiant believes this to be the only manner to recover said evidence.

71. For example, based on my knowledge, training, and experience, your affiant is aware that a powered-on computer maintains volatile data. Volatile data can be defined as active information temporarily reflecting a computer\'s current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks (floppy, tape and/or CD-ROM), and printing activity. Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed. Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

72. Based on my knowledge, training, and experience, your affiant knows that computer files or remnants of such files can be recovered months or even years after they have been

16

downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little to no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

73.    Also, again based on your affiant's training and experience, wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

74.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

75.    Thus, the forensic analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the

17

seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

76.  In cases of this sort, laptop computers and/or smartphones are also used as instrumentalities of the crime to commit offenses involving interstate drug sales and movement of drug proceeds.  Devices such as modems and routers can contain information about dates, frequency, and computer(s) used to access the Internet.  The laptop or smart phone may also have fingerprints on them indicating the user of the computer and its components.

77.  Similarly, files related to the purchasing and selling of controlled substances, as well as, the movement of currency found on computers and other digital communications devices are usually obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the data, search terms used, exchange, transfer, distribution, possession or origin of the files.  Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary internet directory or "cache".  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed internet pages or if a user takes steps to delete them. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

78.  "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. Your affiant knows from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.  Examination of these items can reveal information about the authorized or unauthorized use of internet connection at the residence.

79.  Searching the computer(s) for the evidence described in the attachment may require a range of data analysis techniques.  For example, information regarding user attribution or internet use is located in various operating system log files that are not easily located or reviewed. In addition, a person engaged in criminal activity will attempt to conceal evidence of the

activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this location (the computer) for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

80. Based upon knowledge, training and experience, your affiant knows that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

81. The nature of evidence: As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

82. The volume of evidence and time required for an examination: Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information

for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

83. Technical requirements: Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off- site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

84. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

85. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to, computer-assisted scans of the entire medium that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## VIII. REQUEST FOR SEALING

86. Finally, I respectfully request that this Court issue an order restricting, until further order of the Court, this case, including the Application and Search Warrant. Based upon my training and experience, I have learned that online criminals actively search for criminal Affidavits and Search Warrants via the Internet and disseminate them to others actively seeking out information over the Web and other sources concerning law enforcement activity in this arena. Accordingly, premature disclosure of the contents of this Affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## IX.   CONCLUSION

87. Based on the facts set forth in this Affidavit, I believe there is probable cause that evidence, fruits, proceeds, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance) and 21 U.S.C. § 846 (Conspiracy to Distribute, and to Possess with

Intent to Distribute a Controlled Substance) are concealed in the locations identified in Attachments A-1 and A-2. Accordingly, I respectfully request the issuance of a search warrant authorizing the search of the locations described in Attachments A-1 and A-2, as well as the seizure of items described in Attachment B.

88. Furthermore, I believe that there is probable cause that **MARKIS** committed those same crimes, thus supporting the legal basis for the Court to issue an arrest warrant based on a criminal complaint.

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

Aron Mann
Special Agent
Homeland Security Investigations

Approved as to form:

Amanda Beck
Assistant United States Attorney

Sworn and Subscribed to me on January 23, 2019

Hon. Edmund F. Brennan
United States Magistrate Judge
Eastern District of California

## ATTACHMENT A-1
## LOCATION TO BE SEARCHED

SUBJECT RESIDENCE – **10929 Tower Park Drive, Rancho Cordova, California 95670** – The property is a 1,495 square-foot, tri-level, single-family condominium. It bears a peach stucco exterior. The front door is south facing, and the house number 10929 is displayed to the left of the door. The garage is connected and north facing on the rear of the residence.



The place to be searched includes all of the following, where the items specified in Attachment B might be found:

1. All rooms, attics, basements, and all other parts therein, and surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached.

2. Any computer, digital devices, and digital media located therein.

3. All internal and external compartments and all containers.

## ATTACHMENT A-2
## LOCATION TO BE SEARCHED

SUBJECT VEHICLE – **2011 BMW 335i with license plate 7NUE460**. The SUBJECT VEHCILE has VIN number WBAKG7C55BE264290 and is registered to Carrie Markis at 10929 Tower Park Drive in Rancho Cordova, California. The BMW 335i is a black, two-door coupe.



The search of the SUBJECT VEHICLE is to include all internal and external compartments and all containers that may contain the items listed in Attachment B.

## ATTACHMENT B
## ITEMS TO BE SEIZED

The following records, documents, files, or materials, in whatever form, including handmade or mechanical form (such as printed, written, handwritten, or typed); photocopies or other photographic form; and electrical, electronic, and magnetic form (such as computers, hard drives, flash drives, tapes, cassettes, hard disks, floppy disks, diskettes, compact discs, CD-ROMs, DVDs, optical discs, Zip cartridges, printer buffers, smart cards, or electronic notebooks, or any other electronic storage medium) that constitute or contain evidence, instrumentalities, or fruits of violations of 21 U.S.C. § 841(a)(1) (Manufacture or Distribution of a Controlled Substance), 21 U.S.C. § 846 (Conspiracy to Manufacture, to Distribute, and to Possess with Intent to Distribute a Controlled Substance), and 18 U.S.C. §§ 1956 and 1957 (Money Laundering).

1.      All records relating to the violations described above, including:

     a.      any and all documents, records or information relating to the purchase, sale, importation, possession, shipment, tracking, delivery or distribution of controlled substances;

     b.      any and all documents, records or information relating to the purchase, sale, importation, possession, shipment, tracking, delivery or distribution of packaging materials;

     c.      any and all documents, records or information relating to the purchase, sale, tracking, delivery or distribution of postage or express mail consignment;

     d.      any and all documents, records or information relating to the transfer, purchase, sale or disposition of virtual currency;

     e.      any and all documents, records, or information relating to the access, creation and maintenance of websites and hidden (TOR-based) services;

     f.      any and all documents, records, or information relating to email accounts used in furtherance of these offenses;

     g.      any and all records or other items which are evidence of ownership or use of computer equipment, including, but not limited to, sales receipts, bills for internet access, handwritten notes and handwritten notes in computer manuals.

     h.      any and all records relating to indicia of occupancy, residency, and ownership or use of the SUBJECT RESIDENCE and SUBJECT VEHICLE, including, but not limited to,

utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, identification documents, and keys;

i.      any and all records of any address and/or telephone books, rolodex indicia, electronic organizers, telephone paging devices and the memory thereof, and any papers, records or electronic data reflecting names, addresses, telephone numbers, pager numbers of co-conspirators, sources of controlled substances and/or virtual currency, identifying information for customers purchasing controlled substances and/or virtual currency;

j.      all bank records, checks, credit card bills, account information, safe deposit box information and other financial records;

k.      all copies of income tax returns filed with the Internal Revenue Service (IRS) or the California Franchise Tax Board;

l.      all records related to the purchase of real estate or other assets, or the leasing of storage units,

m.      financial records for MARKIS including foreign and domestic banking records, ledger books, wire transfer instructions, and receipts for wire transfers,

n.      bulk cash in excess of $1,000.

2.      Any digital devices or other electronic storage media and/or their components used as a means to commit the violations described above, including:

a.      any digital device or other electronic storage media capable of being used to commit, further, or store evidence or fruits of the offenses listed above;

b.      any digital devices or other electronic storage media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, cameras, printers, plotters, encryption devices, and optical scanners;

c.      any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

     d.     any documentation, operating logs and reference manuals regarding the operation of the digital device or other electronic storage media or software;

     e.     any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

     f.     any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

     g.     any passwords, password files, seed words, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

3.     For any digital device or other electronic storage media upon which electronically stored information that is called for by this warrant may be contained, or that may contain things otherwise called for by this warrant:

     a.     evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

     b.     evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

     c.     evidence of the lack of such malicious software;

     d.     evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

     e.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

     f.     evidence of the times the digital device or other electronic storage media was used;

        g.      passwords, encryption keys, seed words, and other access devices that may be necessary to access the digital device or other electronic storage media;

        h.      documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the digital device or other electronic storage media;

        i.      contextual information necessary to understand the evidence described in this attachment.

4.      Records and things evidencing the use of an Internet Protocol (IP) address to communicate with the internet, including:

        a.      routers, modems, and network equipment used to connect computers to the internet;

        b.      records of Internet Protocol addresses used;

        c.      records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses.

5.      Any and all hidden services accounts or encrypted chat applications used in furtherance of the offenses described above, including, but not limited to, darknet market accounts, associated darknet forum accounts, Tor-based email accounts, and Wickr handles and logins.

6.      Any and all peer to peer (P2P) virtual currency trading platform accounts, with no legitimate or identified service provider to which legal process may be served, used in furtherance of the offenses described above, including, but not limited to, localbitcoins.com accounts or Bitcoin-OTC internet relay chat channel accounts.

7.      Virtual currency in any format, including but not limited to, wallets (digital and paper), seed words, usernames and passwords, public keys (addresses) and private keys.

8.      Fiat currency (U.S. dollars or other government issued currency).

9.      Keys to storage units, suites, lockers and safe deposit boxes.

10.     Firearms or other prohibited weapons.

11.    Controlled substances and associated paraphernalia.

THE SEIZURE OF DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA
AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS SPECIFICALLY
AUTHORIZED BY THIS SEARCH WARRANT, NOT ONLY TO THE EXTENT THAT
SUCH DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA CONSTITUTE
INSTRUMENTALITIES OF THE CRIMINAL ACTIVITY DESCRIBED ABOVE, BUT ALSO
FOR THE PURPOSE OF CONDUCTING OFF-SITE EXAMINATIONS OF THEIR
CONTENTS FOR EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE
AFOREMENTIONED CRIME.